UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
-----------------------------------------------------------x

SHAWN CHESHIRE,

                       Plaintiff,

           v.

UNITED STATES OLYMPIC COMMITTEE,
and U.S. PARALYMPICS, INC.,

                   Defendants.
-----------------------------------------------------------x

CASE NO.:

**COMPLAINT AND DEMAND
FOR JURY TRIAL FOR:**

**(1) VIOLATIONS OF THE ADA; AND**

**(2) VIOLATIONS OF THE UNRUH
ACT.**

## COMPLAINT

      Plaintiff, SHAWN CHESHIRE, (hereinafter "Plaintiff" or "Cheshire"), sues Defendants,

UNITED STATES OLYMPIC COMMITTEE and U.S. PARALYMPICS, INC. (hereinafter

collectively the "Defendants"), for injunctive relief, attorneys' fees and costs, including but not

limited to disbursements, court expenses and fees, pursuant to 42 U.S.C. § 12181 *et seq.*

(hereinafter "Americans With Disabilities Act" or "ADA"), and for damages pursuant the

California Civil Code §§ 51 *et seq.* (hereinafter "Unruh Act") and alleges:

### JURISDICTION AND VENUE

1. This is an action for declaratory and injunctive relief brought pursuant to Title III of the

    Americans with Disabilities Act, 42 U.S.C. § 12181, *et seq.*  This Court is vested with original

    jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 and § 1343.  This Court has

    supplemental jurisdiction over Plaintiff's state law claim that arises out of the same nucleus of

    facts and circumstances as the subject federal claim.

2. Venue is proper in the Central District of California pursuant to 28 U.S.C. §1391(b), as the

    events involving Plaintiff occurred in this judicial district.

### Shawn Cheshire

3.  At all times material hereto, Plaintiff, Cheshire, was and is over the age of 18 years, *sui juris*, and a resident of the State of Florida and Broward County.

4.  Cheshire is a veteran of the United States Army.

5.  In 2009, Cheshire suffered a traumatic brain injury ("TBI") in her capacity as a first responder that eventually resulted in a complete loss of vision.

6.  The loss of Plaintiff's eyesight has substantially impaired one or more of her major life activities; most obviously, her ability to see.

7.  Cheshire has at all material times suffered from a "qualified disability" under the ADA.

8.  Cheshire requires a cane and/or the assistance of her seeing eye dog for mobility.

9.  In order to compete in a tandem cycling event Cheshire must be accompanied by another individual referred to as a pilot.  The US National Paralympic Cycling Team does not provide its members with a pilot.

10. In April 2017 Cheshire hired Tela Crane ("Crane") to be her pilot.  Crane has fifteen (15) years of cycling experience. Crane has thirty-three (33) national medals, eleven (11) National Championship Titles, five (5) ongoing track records, and is a former 200-meter National Record holder.

11. Cheshire compensates Crane directly for her services.

12. Cheshire was selected to be a member of the US Paralympic cycling team for the first half of 2018.

**The United States Olympic Committee and U.S. Paralympics, Inc.**

13. Defendant UNITED STATES OLYMPIC COMMITTEE ("USOC"), is a federally chartered corporation, 36 U.S.C. § 220502(a), registered to do business in the State of Colorado with its principal place of business in Colorado Springs, Colorado.

14. Defendant U.S. PARALYMPICS, INC. ("USPI"), is a Colorado non-profit corporation with its principal place of business in Colorado Springs, Colorado.

15. Congress empowered the USOC to act as the national Paralympic committee of the United States. 36 U.S.C. § 220505(c)(2).

16. The USOC has responsibility for the United State Paralympic Team.

17. The USOC controls many aspects of Olympic and Paralympic organization, administration, housing, training, policies, procedures, practices, and competition in the United States, including but not limited to managing, regulating and/or controlling the conditions of such organizations, administration, housing, training, policies, procedures, practices, and competition.

18. The USOC selects the training and camp facilities where mandatory training events for competitors are held, thereby controlling all aspects of the venues in which training will take place.

19. The USOC also selects the U.S. cities that will submit bids to host the Olympic and Paralympics Games, thereby controlling all aspects of the venues in which competition will take place.

20. As such, the USOC operates the places of public accommodation where such polices, practices, and procedures for training, housing, and competition take place.

21. Defendants, as the owners and/or operators of these facilities, owe a duty of care to all visitors.

22. Upon information and belief, the USOC owns and/or operates within a number of training facilities across the U.S., including but not limited to the Carson Velodrome.

23. The Carson Velodrome is located at 18400 S. Avalon Blvd., Carson, CA 90746.

24. The USOC is responsible for operating programs, services, and activities, in conformity with federal law, including the ADA.

### The Incident

25. As a Paralympic athlete, Cheshire is required to attend mandatory trainings and or competitions held at different locations throughout the U.S. and all over the world.

26. Cheshire, however, is being denied full and equal access to, and full enjoyment of, the facilities at which Defendants send her to train, inasmuch as Defendants maintain discriminatory policies, practices, and/or procedures; specifically, without any legally sufficient or otherwise good cause, Defendants, through their agents, have prohibited Cheshire from utilizing her seeing eye dog, Kiara, at facilities selected by, utilized by, and/or operated by Defendants.

27. The World Track Championship were scheduled to take place in Rio de Janeiro, Brazil, on March 22 – 25, 2018 (the "2018 WTC").

28. In advance of the 2018 WTC, Defendants held a mandatory training camp for the members of the United State Paralympic Team selected to compete at the 2018 WTC.  The training was held on March 1 – 10, 2018 at the Carson Velodrome.

29. On or about March 2, 2018, Ian Lawless ("Lawless"), the High-Performance Director in charge of the paracycling team for U.S. Paralympics, and his supervisor, Julie O'Neill ("O'Neill") made a decision on behalf of Defendants that Cheshire would not be permitted to utilize her seeing eye dog within the Carson Velodrome or the hotel Cheshire was required to stay as part

of the camp, despite the fact that Cheshire required the use of her seeing eye dog during this time period to be mobile in a safe fashion.

30. On the evening of March 2nd, 2018 Defendants informed Cheshire that her seeing eye dog was no longer allowed within the Carson Velodrome.

31. Later that night, Lawless and numerous other members of the USOC and USPI were informed by email from Cheshire's partner Greg Anderson, at the request of Cheshire, that their actions were completely unjustifiable and placing Cheshire at severe risk of injury. Lawless and O'Neill knew that Cheshire is completely blind, and that her blindness was the result of a TBI.

32. The following day, Lawless sent Cheshire an email that Cheshire was to rely on the team coaching staff for any assistance she needed because of their prohibition on her use of her seeing eye dog.

33. On March 5, 2018, Cheshire traveled to the Velodrome to participate in Defendants' mandatory camp but was precluded from bringing her seeing eye dog.

34. Upon arriving, Cheshire entered the facility and began her training session.

35. During the training session Cheshire needed to use the restroom. Cheshire had always relied on her seeing dog to go to and from the restroom without incident. Since Cheshire was without her seeing eye dog, Cheshire did as she was instructed and sought assistance from the coaches.

36. One of the U.S. Paracycling Team Coaches, Rick Babington ("Babington"), assisted Cheshire across the track.

37. After assisting Cheshire across the track, Babington asked if Cheshire was good to proceed on her own. Cheshire stated that she had never made the trip unaccompanied but would climb the stairs to the pedestrian platform and trail the wall to find the restroom door. Babington then returned to the track without warning Cheshire of any possible obstructions.

38. Cheshire made her way up the stairs and began trailing the wall, using her cane to ensure the walkway was clear of obstacles or obstructions.

39. Suddenly Cheshire struck her head on a low hanging concrete beam, almost knocking herself out.

40. After striking her head, Cheshire was severely disoriented and dazed and stumbled around for some period. She had no idea where she was or what direction she was walking. Eventually, Babington got to Cheshire. Cheshire informed Babington that she had smashed her head into something and struggled to remain conscious. Babington informed Cheshire that there were low hanging concrete beams along the wall which Cheshire must have run into. Babington walked Cheshire to the restroom and then they returned to the track.

41. Cheshire continued her training that day (March 5) and returned to the Velodrome the following day (March 6) to train with the team. During the training after striking her head, Cheshire's performance was significantly diminished.

42. On March 6th, Cheshire sent an e-mail to Lawless stating that she was experiencing severe headaches through the night and reminded him that her blindness was the result of a TBI.

43. On the morning of March 7, Cheshire was finally stopped from training by Defendants. Defendants sent a team doctor to evaluate Cheshire for a possible concussion. The doctor was a chiropractor who had no idea he was being sent to perform a concussion protocol on a para-athlete who was blind as a result of a prior TBI.

44. The chiropractor evaluated Cheshire, concluded that she was showing signs of a concussion and refused to clear her to continue to train. The doctor informed Cheshire that she would need to be referred to another doctor to be cleared for the upcoming 2018 WTC in Rio.

45. On March 16th, Cheshire traveled to the VA hospital in Syracuse, New York, to be examined by her long-term TBI physician.

46. Cheshire's physician performed an evaluation and immediately stated that Cheshire continued to experience significant post-concussion symptoms and emphatically refused to clear her to compete in the 2018 WTC.

47. Cheshire's physician arranged for her to receive a supplemental evaluation and treatment at the Upstate Concussion Center at State University of New York, Upstate Medical University, where Cheshire was treated for the TBI that took her sight.

48. As a result of the concussion Cheshire sustained on March 5, Cheshire was also precluded from competing in the 2018 World Cup road event in Belgium.

49. Cheshire is receiving treatment for the head injury she sustained at the Velodrome and expects to resume training for elite competitions upon receiving medical clearance. Upon receiving such medical clearance, Cheshire immediately intends to again train and race as a member of the U.S. Paralympic team, which will require participation at camps and training facilitates owned and/or operated by Defendants.

50. Cheshire shall require the use of her seeing eye dog at these facilities upon her resumption of such training and race participation.

**Discriminatory Policies as to Blind Members of the U.S. Paracycling Team**

51. Contrary to all other classes of disabled athletes who compete for the U.S. Paracycling team, blind and visually impaired athletes are treated as two athletes (because of the inclusion of a pilot) for purposes of being selected as part of U.S. race teams for international competitions. This incentivizes the Paracycling staff not to include blind and visually impaired athletes in international events.

52. USOC limits selection of blind cyclists for the U.S. Paracycling team because selecting a blind cyclist requires additional efforts and hotel bookings for pilots.

53. USOC chooses many of their U.S. Paracycling international teams in a discretionary fashion, with no objective criteria, and no reporting of their rational for the athletes selected.

54. When the U.S. Paracycling teams travel to international races, the USOC brings replacement wheels and other equipment and parts for bikes used by sighted cyclists, but not for bikes used by blind cyclists.

55. The Team App used for all international race events is not blind accessible.

56. The Athlete and Sport Program Plan, required to be signed by all athletes competing for the U.S. Paracycling team, is not blind accessible.

57. Team building exercises used by the U.S. Paracycling team at team camps and other team events are not blind accessible.

58. Surveys distributed by the U.S Paracycling team at team camps and other events are not blind accessible.

59. Communications by the staff of U.S. Paracycling to paracycling athletes are not blind accessible, perhaps with the exception of the communication Lawless sent to Cheshire prohibiting her from using her seeing eye dog.

60. Prior to knowing that Cheshire would be medically prohibited from competing in the first road world cup racing event for 2018 in Belgium, she was not selected for the team, despite attending the last road race event for U.S. Paracycling in 2017 – the Road World Championships in South Africa.

61. The U.S. Paracycling Team for the second half of 2018 will be based on athlete's performance at the 2018 Track World Championships in Rio and the Belgium World Cup, both of which

races Cheshire was medically prohibited from attending because of the concussion she sustained at the Carson Velodrome.

## COUNT I
## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

62. Plaintiff re-avers and re-alleges the allegations set forth in paragraphs 1-61, as though fully set forth herein.

63. On July 26, 1990, Congress enacted the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.

64. Congress specifically found, *inter alia*, that:[1]

    a.  Some 43,000,000 Americans have one or more physical or mental disabilities, and this number is increasing as the population as a whole is growing older;

    b.  Historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

    c.  Discrimination against individuals with disabilities persists in such critical areas of employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;

    d.  Individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary

---

[1] 42 U.S.C. § 12101(a)(1) – (3), (5), and (9).

qualification standards and criteria, segregation, and relegation to lesser service, programs, activities, benefits, jobs, or other opportunities; and,

e.  The continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

65. Congress explicitly set forth the purpose of the ADA; to wit:[2]

(i)  Provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

(ii) Provide a clear, strong, consistent, enforceable standard addressing discrimination against individuals with disabilities; and,

(iii) Invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

66. The congressional legislation gave places of public accommodation a time period of up to one and a half years from the enactment of the ADA to implement the requirements imposed by the ADA. The effective date of Title III of the ADA was January 26, 1992 (or January 26, 1993, if Defendant has 10 or fewer employees and gross receipts of $500,000.00 or less).[3]

---

[2] 42 U.S.C. § 12101(b) (1) (2) and (4).
[3] 42 U.S.C. § 12181; 28 C.F.R. § 36.508(a).

67. Public accommodations were required to conform to these regulations by January 26, 1992 (or January 26, 1993, if Defendant has 10 or fewer employees and gross receipts of $500,000.00 or less).[4]

68. The facilities are legally required to be, but are not, in compliance with the ADA.

69. Such non-compliance includes the following:

    a. Defendants maintains a policy, practice and/or procedure whereby Plaintiff is unable to rely on her service animal for necessary support with her daily activities; and

    b. Defendants failed to adequately train and supervise its staff to ensure compliance with the provisions of the ADA.

70. Pursuant to the ADA, it is an unlawful discriminatory act for a public accommodation to: "fail[] to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii).

71. In addition to the non-compliance regarding the facilities owned and/or operated by the Defendants as set forth herein, additional policies and procedures of the Defendants are in violation of the ADA, as follows:

    a. Contrary to all other classes of disabled athletes who compete for the U.S. Paracycling team, blind and visually impaired athletes are treated as two athletes

---

[4] 42 U.S.C. § 12181; 28 C.F.R. § 36.508(a).

(because of the inclusion of a pilot) for purposes of being selected as part of U.S. race teams for international competitions.

b. USOC limits selection of blind cyclists for the U.S. Paracycling team because selecting a blind cyclist requires additional efforts and hotel bookings for pilots.

c. USOC chooses many of their U.S. Paracycling international teams in a discretionary fashion, with no objective criteria, and no reporting of their rational for the athletes selected.

d. When the U.S. Paracycling teams travel to international races, the USOC brings replacement wheels and other equipment and parts for bikes used by sighted cyclists, but not for bikes used by blind cyclists.

e. The Team App used for all international race events is not blind accessible.

f. The Athlete and Sport Program Plan, required to be signed by all athletes competing for the U.S. Paracycling team, is not blind accessible.

g. Team building exercises used by the U.S. Paracycling team at team camps and other team events are not blind accessible.

h. Surveys distributed by the U.S Paracycling team at team camps and other events are not blind accessible.

i. Communications by the staff of U.S. Paracycling to paracycling athletes are not blind accessible.

72. Modifications to the policies, practices and/or procedures of the facilities will not fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations offered.

73. As a result of the foregoing, Defendants' failure to make reasonable modifications in its policies practices and/or procedures has discriminated against Plaintiff and others with disabilities, by denying access to, and full and equal enjoyment of, the goods, services, facilities, privileges, advantages and/or accommodations of the facilities and the programs and services provided by Defendants.  Defendants' discrimination is specifically prohibited by 42 U.S.C. § 12182, *et seq*.

74. Moreover, Defendants will continue to discriminate against Plaintiff and others with disabilities unless and until they are compelled by this Court to amend its policies, practices and/or procedures at their facilities and to the programs and services provided by Defendants, which violate the ADA, including but not limited to those specifically set forth herein, and to make the facilities, programs and services provided by Defendants, equally accessible to and usable by persons with disabilities, including Plaintiff.

75. Plaintiff is without adequate remedy at law, and is suffering irreparable harm, and reasonably anticipates that she will continue to suffer irreparable harm unless and until Defendants are required to amend their discriminatory policies, practices, and/or procedures, dangerous conditions, and ADA violations that exist upon the facilities and the programs and services provided by Defendants, including but not limited to those set forth herein.

76. This Court is vested with authority to grant injunctive relief sought by Plaintiff, including entry of an order requiring alteration and modification of the policies, practices, and/or procedures of the facilities and the programs and services provided by Defendants so as to make readily accessible to and useable by individuals with disabilities to the extent required by law.

## COUNT II
## VIOLATIONS OF THE UNRUH ACT

77. Plaintiff re-avers and re-alleges the allegations set forth in paragraphs 1-61, as though fully set forth herein.

78. Section 51(b) of California's Unruh Civil Rights Act provides:

> All persons within the jurisdiction of this state are free and equal, and no matter what their . . . disability [or] medical condition . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

79. Violation of a right protected by the ADA also constitutes a violation of the Unruh Act. Cal. Civil Code § 51(f).  As such, Plaintiff's claim for relief is expressly incorporated as a violation of the Unruh Act.

80. Plaintiff is a person with a disability within the meaning of the Unruh Act.

81. Defendants' facilities, including but not limited to the Carson Velodrome, are a business establishment within the meaning of the Unruh Act.

82. By virtue of the discriminatory policies, practices, and/or procedures alleged herein, Defendants have discriminated against Plaintiff by failing to provide equal access to their facilities and services, in violation of the Unruh Act.

83. Plaintiff is entitled to declaratory and injunctive relief, as well as up to three times actual damages, but no less than $4,000 per violation, and reasonable attorneys' fees and costs. Cal. Civil Code § 52(a).

## **DEMAND FOR JURY TRIAL**

PLEASE TAKE NOTICE that Plaintiff, SHAWN CHESHIRE, demands a jury trial in this action on all issues so triable.

WHEREFORE, Plaintiff hereby demands judgment against the Defendants and requests the following injunctive and declaratory relief:

a.  A declaration that Defendants are in violation of the ADA and the Unruh Act;

b.  Entry of immediate, temporary, and permanent injunctive relief prohibiting Defendants from disallowing Plaintiff CHESHIRE, or any other disabled individual, from being accompanied by their service animal at any training, practice, or other facility;

c.  An Order requiring Defendants to evaluate and neutralize their policies, practices and procedures towards individuals with disabilities, for such reasonable time to allow the Defendants to undertake and complete corrective procedures;

d.  An Order requiring Defendants to modify their policies, practices and procedures in relation to their programs and services, so that persons who are blind, including Plaintiff, are treated equal to those who are sighted as it relates to team selection, team travel, and participation in such programs and services;

e.  An Order requiring Defendants to cease discriminatory policies as required pursuant to Title III of the ADA and the Unruh Act;

f.  An award of reasonable attorneys' fees, costs, disbursements and other expenses associated with this action, in favor of the Plaintiff;

g.  An award of up to three times actual damages, but no less than $4,000 per

violation of the California Civil Code; and

h.  Such other and further relief that this Court deems just, necessary and proper.

DATED this __**29**__ day of June**,** 2018.

Respectfully Submitted,

By: Brett A. Greenfield, Esquire
BRETT A. GREENFIELD, Esq.
California Bar Number: 217343
KENNER & GREENFIELD
16633 Ventura Blvd., Suite 1212
Encino, CA 91436
Tel:      818.995.1195
Fax:      818.475.5369
E-mail:   Brett@kennergreenfield.com